UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


MELISSA DAWN WARD                    )
                                     )
V.                                   )          NO. 2:10-CV-7
                                     )
MICHAEL A. STILL, *ETC*., *ET AL.*    )


### MEMORANDUM OPINION

As the result of an encounter she had with officers of the Bristol Tennessee Police

Department on January 17, 2009, plaintiff has sued several officers, named and unnamed, for

an assortment of constitutional violations pursuant to 42 U.S.C. § 1983, as well as asserting

various state causes of action related to the incidents that occurred on January 17, 2009.  She

has also sued the City of Bristol and its Chief of Police for failure to properly train and

supervise the city's police officers.  Lastly, she has sued named and unnamed police officers

for malicious harassment in the months following the January 17, 2009 events.   All

defendants have filed motions for summary judgment.

Summary judgment is appropriate only if there are no genuine issues regarding any

material facts and, based upon those undisputed facts, the moving party is entitled to

judgment as a matter of law.  F.R.Civ.P. 56(c).  The moving party has the initial burden

of proving that there are no genuine issues of material facts and that the moving party is

entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett,* 47 U.S. 317 (1986)*;

Street v. J.C.Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  If the moving party

meets that burden, the non-material moving party then has the burden of producing evidence that demonstrates the existence of a fact, or a dispute concerning a material fact, that precludes summary judgment. The court must draw all possible favorable inferences in favor of, and construe the evidence in the light most favorable to, the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). However, the evidence in favor of the non-moving party must be enough to support a jury verdict in that party's favor. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson, supra*, at 2511.

A police officer should be held accountable for violation of a person's constitutional rights, and a suit for damages usually is the only way for the injured person to obtain vindication. On the other hand, unrestricted damage suits can harass and intimidate police officers, whether intentionally or unintentionally, the result of which is ineffective police work. The doctrine of qualified immunity was created to balance these competing considerations. In *Saucier v. Katz*, 530 U.S. 194 (2001), the Supreme Court held that in a suit for violation of a constitutional right against a police officer, the trial court must first consider whether "the facts alleged show the officer's conduct violated a constitutional right." *Id.*, at 201. If the plaintiff does establish that a constitutional violation occurred, then the court should go further and determine "whether the right was clearly established in . . . light of the specific context of the case, not as a broad proposition." *Id.* In determining whether or not the right was clearly established, the dispositive question is "whether it would

2

be clear to a reasonable officer that his conduct was unlawful in the situation he confronted

. . . .  If the law did not put the officer on notice that his conduct would be clearly unlawful,

summary judgment based on qualified immunity is appropriate."  *Id.*

The majority of facts are undisputed; but where a fact is disputed, the version

favorable to the plaintiff has been adopted.  Similarly, if two contrary inferences could have

been drawn from an otherwise undisputed fact, the court has relied upon the inference that

is favorable to the plaintiff.

Some time during the late evening hours of January 16, 2009, or the extremely early

morning hours of January 17, 2009, plaintiff and two friends, Amber McMurray and Joshua

Slate, "socialized."  That socializing consisted of ingesting a large amount of alcohol.

Ultimately, they patronized Machiavelli's Bar in Bristol.  Machiavelli's Bar occupies the first

floor of a three-story building; the next two floors contain apartment dwellings, four on each

floor.  Plaintiff lived in an apartment on the third floor.  At approximately 2:00 a.m., plaintiff

and her two friends left the bar and went upstairs to her apartment.

Eric Crawford lived in a second floor apartment, and he was invited by Joshua Slate

to join him and the two women in plaintiff's apartment.  Once there, the drinking continued

apace.  Around 4:00 a.m., the two women, both drunk, retired to plaintiff's bedroom and

went to sleep.[1]

As plaintiff and Ms. McMurray slept, Slate and Crawford continued to drink in

---

[1]Whether they "went to sleep," or passed out, is a matter of semantics only.  Regardless,
alcohol intoxication was the moving force in all that happened that night.

plaintiff's kitchen. After a time, they got into a fight. Crawford left to return to his own apartment on the floor below, and Slate followed. Slate resumed the battle on the second floor, and he was the decided loser; Crawford "put him down as hard as [he] could." Slate bled on the carpeting in the hallway, and he smeared blood on the stair rail up to the third floor. According to Crawford, Slate was extremely drunk.

Another resident of the building, later learned to be Candace Hackler, heard and saw the fight, and she called 911.

Michael Still was the first officer on the scene, arriving at 5:35 a.m. He encountered two people, a man and a woman, on the second floor landing. The woman was Candace Hackler who of course had just called 911. The man was Eric Crawford.

Officer Still remotely activated his in-car recording equipment. Although the camera was not able to record anything of significance, the microphone on Still's body transmitted his voice and the voices of others in proximity to him to the recording equipment in the car. As a result, most of the significant events were audibly recorded by the device in Still's car.

Still questioned Crawford, and Crawford related the circumstances of his two fights with Joshua Slate. Crawford also told Still that Slate had entered into the apartment on the third floor.

As Officer Still interviewed Crawford, another officer, Albert Overbey, had arrived and was interviewing Ms. Hackler.

At this point, Officer Still knew that a fight had occurred in the apartment building that was serious enough to prompt Ms. Hackler to call 911. He also knew, based on his

4

interview with Crawford, that Mr. Slate was highly intoxicated; that he had been punched twice in the face, rather hard, during the first fight in plaintiff's kitchen; that Slate was drunk enough that he did not have enough sense to remain in plaintiff's apartment when Crawford left; that he followed Crawford to the second floor, where he resumed the fight; and that Crawford hit him several times with enough force that Slate went to the ground, where he remained for a time. And, of course, there was evidence of Slate's bleeding on the carpet and the stair railing. Officer Still was concerned about Slate's well-being in light of his intoxication and the physical beating he sustained. He therefore went upstairs to the apartment to conduct a "welfare check." By this time, another officer, Jody Camper, had arrived, and Still apprised him of all he knew to that point.

At 5:44 a.m., Still began knocking on plaintiff's apartment door. It is important to note at this point that Officer Still had no idea who lived in the apartment; he knew only that Slate was in there, based on what Crawford had told him.

After three minutes of banging on the door, Officer Still returned downstairs and asked Crawford if he knew how to contact anyone who would have keys to the apartment because he was trying to avoid a forced entry. In response, Crawford told Officer Still that Slate was in the apartment with two other people, and if the occupants did not hear the loud knocking, "something [is] wrong with them 'cause everybody else heard that." This information, coupled with the lack of any response from inside the apartment, heightened Officer Still's concern and his perceived need to perform a welfare check.

Officer Still and the other officers went back to the third floor apartment, and again

5

knocked on the door. They also knocked on the walls. Again, they received no response from anyone inside the apartment.

The officers made several efforts to contact people who might have a key to the apartment, but they were unsuccessful. Officer Overbey then contacted the shift supervisor, Sergeant Smalling, who gave the officers authorization to enter the apartment by force.

Before resorting to forced entry, the officers knocked again, twice. Finally, Officer Still gave two verbal warnings that he was going to kick in the door unless it was opened. Receiving no response, he kicked in the door. As the officers entered the apartment, another officer, Brandon Carter, arrived, bringing the total number of police officers to four. By this time, there was an ambulance and four emergency medical technicians outside the building, awaiting assurance from the officers that it was safe for them to enter.

The police officers first entered the apartment living room, and no one was there. They then looked into the kitchen, and again no one was there. They then looked into the bedroom, and saw two women passed out (or asleep) in the bed, both fully clothed. Again, there was no sign of Mr. Slate. However, inside plaintiff's bedroom, Officer Camper opened a door that led into a small bathroom, and there he observed Mr. Slate slumped over the sink. Blood covered the sink.[2] According to Officer Camper, he tried to rouse Slate, but Slate was only semi-conscious. Camper tried to move Slate out of the bathroom, but Slate struggled,

---

[2]Photographs of the blood spatterings and smears in the hallway, on the railing, and on the sink, were filed as Document 49-3. One of those photographs is of Mr. Slate's face. It would not be too much hyperbole to say that his nose looked like chopped liver.

causing both men to fall to the floor. Officer Camper ended up by handcuffing Slate for the safety of both men. According to Camper, he did not then believe that Slate was resisting arrest, but was merely "out of it," and did not appreciate what was happening, which was a reasonable conclusion in light of Slate's intoxication and the physical beating he had sustained.

Notwithstanding the hubbub then occurring in the bedroom, both plaintiff and Ms. McMurray slept on.

**ILLEGAL ENTRY**

It is appropriate to pause here to discuss plaintiff's claim that Still and the other officers violated her right to be secure in her home as guaranteed by the Fourth Amendment.[3] She argues that the officers made no attempt to obtain a warrant. She additionally argues that there were no exigent circumstances justifying a warrantless entry since the information relied upon by Officer Still was imparted to him by Crawford, who was an "unreliable source."

Plaintiff has sued both Still and Camper in their individual and official capacities for

---

[3]Plaintiff apparently asserts in her complaint that the officers' entry into her apartment violated her First, Fourth, and Fourteenth Amendment rights. [Complaint, ¶ 43]. In her response to the officers' motions for summary judgment, she discusses only the Fourth and Fourteenth Amendments. Regardless, the Fourth Amendment explicitly applies to, and proscribes, intrusive conduct by government agents, as a result of which all claims that an officer used excessive force during an arrest must be analyzed under the Fourth Amendment's reasonableness standard, *Graham v. Conner*, 490 U.S. 387, 395 (1989). The same rationale surely must apply to entries into a citizen's home by the police.

illegal entry into her apartment[4]

An "exigent circumstance" is one that requires immediate action; time not only is of the essence, it is critical. The Supreme Court has long recognized that there are exceptions to the Fourth Amendment's requirement for a warrant, and the presence of exigent circumstances is one of those exceptions:

> [W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona,* 437 U.S. 385, 393-394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).
>
> One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. " ' The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' " *Id.,* at 392, 98 S.Ct. 2408 (quoting *Wayne v. United States,* 318 F.2d 205, 212 (C.A.D.C.1963) (Burger, J.)); see also *Tyler, supra,* at 509, 98 S.Ct. 1942. Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. *Mincey, supra,* at 392, 98 S.Ct. 2408; see also *Georgia v. Randolph, ante,* at 118, 126 S.Ct. 1515, 1525, 164 L.Ed.2d 208 ("[I]t would be silly to suggest that the police would commit a tort by entering ... to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur").

*Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).

---

[4] Officers Overbey and Carter also entered the apartment. Presumably Overbey and Carter are two of the "John Doe" officers also sued in their individual and official capacities.

In the Sixth Circuit, the substitution of a named party for a John Doe defendant is a change in party, not a substitution of parties; thus, the naming of a John Doe defendant cannot be used to circumvent the statute of limitations. *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996). An action under 42 U.S.C. § 1983 brought in a district court in Tennessee is governed by Tennessee's one-year statute of limitations, *Rowe v. Board of Ed.*, 1985 WL 12898 (6th Cir. 1985). As a result, the suit against the John Doe defendants must be dismissed on the basis of the running of the statute of limitations.

8

Crawford freely acknowledged that it was he who fought with Slate and perhaps injured him badly. By so doing, he potentially exposed himself to both criminal and civil liability. And, it may be asked, why would Crawford lie to the police about what he did, and where Slate went? If the story he told to Officer Still was false, he exposed himself to criminal liability, another indication of Crawford's reliability, not the reverse. *See, United States v. Christmas*, 222 F.3d 141, 144 (4th Cir. 2000).

Moreover, there was more than Crawford's bare assertion that he had injured Slate in a fight, and that Slate had entered plaintiff's apartment. First, physical evidence of the fight as described by Crawford was visible; blood was on the bannister and the carpet, both of which substantiated Crawford's assertions regarding the severity of the blows he landed to Slate's body. Second, the fight was long and loud enough that it prompted Ms. Hackler to call the police in the first place. It is beyond argument that Officer Still had probable cause to believe that there was a fight; that Slate was injured in that fight; and that he retreated into plaintiff's third floor apartment. Nevertheless, was Officer Still obliged to attempt to procure a warrant? If the question was solely one involving evidence of a crime, arguably the officer should have obtained a warrant. But the concern that night was Slate's well-being. Repeated pounding on the doors and walls of the apartment, and yelling, generated no response from within the apartment, a circumstance which could only heighten the officers' concern about Slate's health. At this juncture, analyzing the issue from *Slate's* perspective might be helpful. What if Slate had been so severely beaten that he was unconscious and bleeding in the brain? What if he had passed out due to his intoxication, or the beating, and was choking

9

on his own blood?  Literally every second would have been critical, and the time expended in getting a warrant could have resulted in permanent brain injury, or death.

There is no evidence in this record to contradict Still's assertion that he was motivated to enter the apartment for the sole purpose of conducting a "welfare check."  The undisputed exigencies of the situation demanded immediate action and excused the requirement for procuring a warrant.   There was no illegal entry.

## PLAINTIFF'S ARREST

Plaintiff contends that her arrest violated her constitutional right to be free from fear, danger, and intimidation as guaranteed by the First, Fourth, and Fourteenth Amendments to the Constitution, and it deprived her of her liberty without due process of law in violation of the Fifth and Fourteenth Amendments.[5]  She also asserts that her arrest violated her right to equal protection and her right to substantive due process in violation of the Fifth and Fourteenth Amendments to the Constitution.[6]  Lastly, she argues that her arrest violated her right to be free from unreasonable seizure as guaranteed by the Fourth and Fourteenth Amendments to the Constitution.[7]  The essence of plaintiff's claim is that she was arrested without probable cause.

Once again, the Fourth Amendment would seem to be the only one applicable to the facts as alleged by plaintiff in her complaint since it unequivocally applies to seizures of the

_____

[5]Complaint, Doc. 1, ¶ 43.

[6]Doc. 1, ¶ 45.

[7]Doc. 1, ¶ 46.

10

person. *Graham v. Conner, supra.*

In determining whether an officer is liable under 42 U.S.C. § 1983 for false arrest, it first must be determined whether the officer had probable cause to make the arrest. If he did, then obviously there was no constitutional violation and the claim fails. If there was no probable cause, however, then the inquiry proceeds one step further: would a reasonable officer in the position of Still and Camper *believe* he had probable cause to make the arrest under identical circumstances? If yes, then Still and Camper are entitled to qualified immunity, *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

It was mentioned previously that plaintiff and Ms. McMurray did not awaken from their sleep notwithstanding (1) the door to the apartment was kicked in; (2) four officers entered the apartment; (3) at least two of those officers entered the small bedroom where the women slept; and (4) one officer engaged in a struggle with Mr. Slate in the adjoining bathroom, finally handcuffing him. This uproar notwithstanding, the women did not awaken.

Officer Still reasonably concluded that he had to talk to the women. First, he needed to explain to them why the door to the apartment was kicked open. Second, he understandably wanted the women to be aware that the apartment was no longer secure; one can only image the public uproar that would have ensued had the officers left two intoxicated women asleep in bed, in an apartment with no door. Third, he needed to find out if Slate was in the apartment with permission of either of the women.

11

Awaking the women was no easy task. In his first affidavit,[8] Still remarks on the difficulty, but says nothing further. In a later affidavit, he says that he shook plaintiff's hand and arm in an attempt to awaken her but, when that proved unsuccessful, he resorted to "wrist compression," a technique where the hand is bent downward in the direction of the elbow. The pain produced by this maneuver is intended to cause stuporous persons to awaken.[9]

According to Still, both plaintiff and Ms. McMurray were extremely intoxicated. Nevertheless, in Still's first affidavit,[10] he says that he had no intention to arrest either of the women. However, matters deteriorated when plaintiff demanded that he explain again to her why he kicked in the door. At Still's invitation, the two of them stepped out into the hallway to look at the blood trail left by Slate. Plaintiff began speaking very loudly and both Officer Still and Officer Camper told her to quieten down. Camper went so far as to warn plaintiff that she was going to jail if she did not cease yelling. Both officers told her to step back inside her apartment and she refused. The plaintiff ran away down the hallway, repeatedly yelling "No!" McMurray then asked the plaintiff to come back into the apartment with her, but plaintiff's only response was to ask Officer Camper, for at least the second time, what his name was. She then asked what was going on, to which Still responded, "You're being arrested." Still told her that she was out in a hallway "screaming and hollering" and Camper

---

[8]Doc. 50, ¶ 29.

[9]Doc. 61-1, ¶¶ 6-14.

[10]Document 50.

added that he had asked her to go back inside the apartment and she did not. At that point, plaintiff said that she would go back inside the apartment, but Still said no.

Plaintiff's version of what transpired in the hallway differs, but only in a few inconsequential particulars. She testified in her deposition that it was she who wanted to go back into her apartment, but she was blocked by Officer Still from doing so.[11] When directly asked if she knew whether she was "loud or not out in the hall" she testified that she could not recall.[12] Therefore, the affidavits of Officer Still and Camper are uncontradicted regarding plaintiff's loud talking and (ultimately) screaming in the hallway. Additionally, a DVD containing the audio recording of the encounter between plaintiff and the officers, including the events immediately leading up to her arrest was filed as Exhibit A to Still's affidavit.[13] The defendants prepared a transcript of that recording, which is filed as Exhibit B. The transcript was submitted to plaintiff and her attorney for review, and its accuracy has not been questioned.[14] That transcript, to the extent typewritten words can do so, corroborates Officer Still's version of the events that precipitated his arrest of plaintiff. However, a written transcript has its limitations, especially when the basis of the arrest was disorderly conduct and public intoxication.[15] Therefore, the court listened to the audio

---

[11]Deposition, Doc. 43-1, p. 54.

[12]Doc. 43-1, p. 56.

[13]Doc. 50.

[14]*See*, Doc. 45, p. 3, fn.3.

[15]Doc. 50, ¶ 50.

recording itself, and it confirms that plaintiff was loud, uncooperative, and did not heed Still's and Camper's repeated instructions to be quiet and to go back into the apartment.

As noted earlier, the only disputed fact in those relating to her arrest is plaintiff's deposition testimony that she wanted to reenter her apartment but was prevented from doing so by Officer Still, and that an unknown officer suddenly "put his foot on my back, pushed me to the ground, and proceeded to handcuff me."[16] From this testimony it can be inferred that plaintiff asserts that she would have reentered her apartment but for Still's interference and she was only arrested thereafter.

One could argue, albeit very weakly, that if plaintiff had been allowed to reenter her apartment, the yelling and screaming which ultimately precipitated her arrest would not have occurred, and therefore she would not have been arrested. That really begs the question, since the fact remains that she did talk loudly, notwithstanding Still's and Camper's instructions to her to quieten down. Thus, this issue of fact actually is not material to the question regarding the legitimacy of plaintiff's arrest.

But there is yet another reason to ignore this disputed "fact" in the summary judgment analysis: "Under the physical facts rule, where the 'palpable untruthfulness of plaintiff's testimony' is evident, because the testimony is 'obviously inconsistent with, contradicted by, undisputed physical facts,' . . . summary judgment is warranted notwithstanding testimony offered by the plaintiff."[17] In this case, the "physical facts" are those in the undisputed

---

[16]Depo., Doc. 49-4, p. 56.

[17]*Harris v. General Motors Corporation*, 201 F.3d 800, 803 (6th Cir. 2000).

14

transcript of the audio recording. That transcript shows that Camper and Still repeatedly told plaintiff to quieten down and she did not do so; that she was repeatedly asked by the officers to go back inside her apartment, and she did not do so; that even her friend, Amber McMurray, asked her to come inside the apartment, and she did not do so. It was only after plaintiff was arrested that she attempted to reenter her apartment, and it was Still that restrained her.

Plaintiff also argues that she was asleep in her own apartment, where she had a right to be; that she suddenly was awakened from that sleep and was confronted by a "highly charged atmosphere" created by the defendants; and that it was the defendants who took a "disoriented" plaintiff into the hallway, thereby effectively creating the very situation for which she ultimately was arrested.[18] The problem with plaintiff's argument is that the exigencies of the situation *required* the officers to enter her apartment, and they had no choice but to enter the apartment in the way they did because of the occupants' failure to respond to the officers' knocking and yelling. Therefore, in reality, the "situation" was created not by the officers, but by the plaintiff and her friends. Further, the officers were required to talk to the residents of the apartment and notify them that the door was smashed open and the reason it was smashed open. And, lastly, it must be remembered that Officer Still took plaintiff into the hallway because it was plaintiff herself who demanded that Still explain to her – not for the first time – why he had kicked her door in. Again, if plaintiff was

---

[18]Doc. 58, pp. 16-17.

disoriented, it was of her own making.[19]

Thus, it is undisputed that plaintiff, while in the hallway of the apartment building, was talking loudly, even yelling, and declined to heed the officers' instructions to be quiet and to reenter her apartment. The question then becomes, did these actions give rise to probable cause to believe that plaintiff committed the offense of either public intoxication or disorderly conduct?

As an initial matter, Officer Still was asked on his discovery deposition about his definition of "probable cause." He answered that probable cause is "a set of circumstances that would lead a reasonable prudent person to believe that a crime had been, was being, or was about to be committed."[20] Plaintiff's attorney argues that his definition is erroneous.

The Supreme Court of the United States has been called upon in many cases to define, in one context or another, probable cause. In 1925, the Supreme Court stated that probable cause exists where "the fact and circumstances within [the officers'] knowledge, and of which they had reasonably trustworthy information . . . [are] sufficient in themselves to warrant a man of reasonable caution in the belief that . . ." a crime has been or is being committed. *Carroll v. United States*, 267 U.S. 132, 162 (1925). With all respect to plaintiff's counsel, this court cannot see any *real* difference between Officer Still's definition and that of the Supreme Court. *See also, United States v. Beasase*, 521 F.2d 1306 (6th Cir.

---

[19]The transcript reveals that the officers continually talked to both women in calm, measured tones, and did nothing (beyond their initial entry) to precipitate plaintiff's reaction.

[20]Doc. 60-2, p. 4.

16

1975): "The probable cause requirement . . . is satisfied if the facts and circumstances are such that a reasonable prudent person would be warranted in believing that an offense had been committed . . ." *Id.*, 1307.

Officer Still arrested plaintiff for public intoxication and disorderly conduct, both of which are statutory misdemeanors in Tennessee.

The statute creating the offense of disorderly conduct is Tenn. Code Ann. § 40-7-103:

> **39-17-305. Disorderly conduct.** – (a) A person commits an offense who, in a public place and with intent to cause public annoyance or alarm:
>
>> (1) Engages in fighting or in violent or threatening behavior;
>>
>> (2) Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard or other emergency; or
>>
>> (3) Creates a hazardous or physically offensive condition by any act that serves no legitimate purpose.
>
>> (b) A person also violates this section who makes unreasonable noise that prevents others from carrying on lawful activities.
>
>> (c) A violation of this section is a Class C misdemeanor.

The statute that creates the offense of public intoxication, Tenn. Code Ann. § 39-17-310, reads as follows:

> **39-17-310. Public intoxication**. – (a) A person commits the offense of public intoxication who appears in a public place under the influence of a controlled substance or any other intoxicating substance to the degree that:
>
>> (1) The offender may be endangered;

(2) There is endangerment to other persons or property; or

(3) The offender unreasonably annoys people in the vicinity.

(b) A violation of this section is a Class C misdemeanor.

Plaintiff was (1) under the influence of alcohol, by her own admission,[21] and (2) she was in a public place, *viz.*, the apartment building hallway. The fact that she was in the hallway at Still's invitation is of no consequence since there is no suggestion that Still enticed her into the hallway to ensnare her into the commission of a criminal offense. Moreover, he and Camper asked her several times to go back into her apartment, and she did not do so. Although plaintiff's often-silly babbling was calculated to annoy neighbors had she been allowed to continue her conduct, the more important consideration was her safety. Up to the point she was arrested, her behavior was not altogether rational, and she chose to run down the hallway rather than return to the relative sanctuary of her apartment.

As far as disorderly conduct is concerned, her behavior arguably constituted a "physically offensive condition . . . that [served] no legitimate purpose." However, there is a serious question that she engaged in this conduct with the intent to cause public annoyance or alarm.

But it is unnecessary to decide whether plaintiff's conduct actually gave rise to probable cause to believe that she committed either or both of the offenses for which Officer Still charged her. At the very least, a reasonable officer in Still's position, confronting the facts as he describes, could have believed that there was probable cause to arrest plaintiff for

---

[21]Complaint, ¶ 15.

public intoxication. That being so, under the authority of *Anderson v. Creighton, supra*, and *Devenpeck v. Alford*, 543 U.S. 146 (2004), the defendants are entitled to qualified immunity regarding plaintiff's arrest.

Plaintiff also has advanced state law claims against the defendants for false arrest and false imprisonment. Those claims have no substantive difference from her federal Fourth Amendment claim. For precisely the same reasons as discussed with regard to the Fourth Amendment claim, the defendants are entitled to qualified immunity regarding these two state claims. The common law doctrine of qualified immunity applies to claims against police officers based on state law. *See, e.g., Cawood v. Booth*, 2008 WL 4998408 (Tenn. App. 2008), and *Willis v. Neal*, 247 Fed. Appx. 473, 477 (6th Cir. 2003).

**EXCESSIVE FORCE; ASSAULT AND BATTERY**

Plaintiff's complaint merely asserts that a "defendant officer" used excessive force on January 17, 2009, in violation of the Eighth and Fourteenth Amendments,[22] and that the same acts constituted an assault and battery under state law (¶¶ 71-73). In her deposition, she testified that while Officer Still stood in front of her and blocked her entry into her apartment, an unknown officer came up behind her; put his foot in her back, pushed her to the floor; and then handcuffed her.[23] Presumably this unknown officer was one of the "John

---

[22]Complaint, ¶ 47. Again, the Fourth Amendment is the appropriate constitutional provision, *Graham v. Conner, supra.*

[23]Depo., Doc. 43-1, pp. 54-56.

19

Does" named as defendants in the complaint. She testified that it was when her hands were jerked behind her back that her right wrist was injured, for which she sought and obtained medical treatment.[24]

But, since the filings of the motions for summary judgment, things have taken a peculiar turn with respect to this aspect of the case. In Still's affidavit filed in support of his motion for summary judgment, he says that there was no "unknown officer" in the hallway, a fact which he asserts is borne out by the transcript.[25] Thus, at the point defendants filed their motions for summary judgment, the plaintiff had testified in her deposition that it was an unknown officer behind her who threw her to the floor and injured her wrist while handcuffing her, as Still blocked her entry into her apartment, which was juxtaposed with Officer Still's version that there was no such officer, an assertion which seems to be corroborated by the transcript.

But in plaintiff's response to the motions for summary judgment, she asserts for the first time (through her attorney only, it is noted), that it was Officer Still who took her to the ground, put his knee in her back, and placed handcuffs on her.[26]

First, since this assertion is by plaintiff's lawyer, as opposed to the plaintiff herself, it is of no use to either the plaintiff or the defendants as far as summary judgment is concerned. Second, even if the plaintiff in some manner could explicitly adopt this statement

---

[24]Ward's Depo. p 64.

[25]Doc. 50, ¶ 48.

[26]Plaintiff's response, Doc. 58, p. 6.

20

as her own, it still is of no use as far as summary judgment is concerned; a party who has been examined by deposition may not rely upon an affidavit (or a statement of counsel) to contradict the deposition so as to create an issue of fact. *Farrell v. Automobile Club*, 870 F.2d 1129, 1132 (6th Cir. 1989). Therefore, there indeed is an issue of fact regarding who used excessive force on the plaintiff. Plaintiff testified on her deposition that it was an unknown officer, whereas Still says that there was no such officer.

To thoroughly confuse the matter even further, Officer Still testified on his pretrial discovery deposition that he applied the "wrist compression" technique on the plaintiff in order to awaken her, which was long before she was arrested. Plaintiff, however, has not claimed in any document or pleading that she was injured by any means other than by having her hands jerked behind her back as described in her deposition. Therefore, as far as facts which this court may consider for purposes of summary judgment, the court must adopt those advanced by the plaintiff, which is that an unknown officer pushed her down from the back, and injured her wrist while handcuffing her. Looking no further than that, plaintiff has presented a jury question. But to what practical effect? As discussed in footnote 4, *supra*, plaintiff's suit against the John Does must be dismissed.

There is no evidence in this record that Officer Still was the officer who shoved plaintiff from behind and handcuffed her. For that reason, Officer Still's motion for summary judgment is granted on the excessive force claim. The assault and battery claim must be dismissed for the same reason since it is premised on the same facts. Similarly, Camper's motion for summary judgment on the excessive force and assault and battery

21

claims is granted.

Even if plaintiff unequivocally blamed Officer Still and his use of the wrist compression technique for the injury to her wrist, he nevertheless would be entitled to qualified immunity. He swore in his second affidavit that he was taught two techniques to be used to arouse an unconscious person. One technique involved a "sternal rub," which consisted of rubbing one's fist on the unconscious person's sternum to produce a pain that will cause that person to awaken. The other technique was the wrist compression described on page 12. Still opted for the second procedure because he did not feel comfortable in rubbing his fist between plaintiff's breasts, and because he had used the wrist compression technique before without ever being told that it had caused an injury.[27]

Although an excessive force claim is analyzed under the Fourth Amendment's "objective reasonableness" standard, *Graham v. Conner, supra*, the issue of qualified immunity nevertheless requires an independent analysis, *Saucier v. Katz, supra*. If it be assumed for the sake of discussion that the wrist compression technique was objectively unreasonable and thus a violation of the Fourth Amendment, the right was not sufficiently clear that Officer Still would have understood that what he was doing violated that right. *See, Anderson v Creighton, supra*, at 640.

**MALICIOUS PROSECUTION**

Officer Still arrested plaintiff for disorderly conduct and public intoxication. Officer

---

[27]Doc. 61-1, ¶¶ 6-14.

Camper had nothing to do with filing the formal charges against plaintiff.

To maintain a suit for malicious prosecution, the plaintiff must prove that (1) the underlying judicial proceeding was instituted without probable cause, (2) that the defendant brought that prior action with malice, and (3) the underlying action was finally terminated in plaintiff's favor.[28] *Roberts v. Federal Express Corp.*, 842 S.W.2d 246 (Tenn. App. 1992).

Plaintiff has come forward with no facts to contradict Officer Camper's assertion that he had nothing to do with procuring her prosecution for public intoxication and disorderly conduct. Therefore, his motion for summary judgment is granted.

As far as Officer Still is concerned, as discussed earlier in this opinion, he reasonably believed that he had probable cause to arrest plaintiff for public intoxication and disorderly conduct, as a result of which he is entitled to qualified immunity on her claims that he arrested her without probable cause. It logically follows that he also is entitled to qualified immunity on his decision to prosecute her for the offenses for which he arrested her. Just as importantly, the actual decision to prosecute was made by an assistant district attorney.[29] Still's motion for summary judgment is likewise granted.

## CONSPIRACY CLAIMS

In paragraph 50 of her complaint, plaintiff alleges that Still, Camper, and the John Does conspired on January 17, 2009, to deprive her of her constitutional rights. She does not

---

[28]Still's affidavit, Doc. 50, ¶ 50; Camper's affidavit, Doc. 46, ¶ 11. The General Sessions Court judge dismissed the case based on a finding of improper entry; it never went to trial.

[29]Still's affidavit, Doc. 50, ¶ 50.

23

specifically name those constitutional rights, nor does she describe any particular event. It is assumed that she is generally referring to her claims of illegal entry into her apartment, false arrest, and the excessive force used upon her during the arrest.

Plaintiff has not responded to the defendants' motions for summary judgment on this particular claim, so it is presumed that she concedes that she has no evidence that Camper and Still conspired to deprive her of her constitutional rights in general, or her right to equal protection under the law in particular, and she is obliged to come forward with such evidence, if she has it; *see, Royal Oak Entertainment, LLC v. City of Royal Oak Michigan*, 205 F.Appx. 389, 399 (6th Cir. 2006).

In paragraph 51 of her complaint, she contends that Officer Still, Officer Brown, and the John Does conspired with one another to deprive her of her constitutional rights by their harassment of her after November 11, 2009.

As mentioned in footnote 27, *supra*, the General Sessions Court judge dismissed the charges against plaintiff on the basis that Still and the other officers illegally entered plaintiff's apartment. She testified on her deposition that she thereafter was targeted by Officer Still, presumably to retaliate for that dismissal. She testified that she was stopped for speeding Officer Still, and given a ticket; she testified that another officer stared fixedly at her; that yet another officer followed her to the gym where she worked out. The defendants devoted considerable documentation in their motions for summary judgment that neither Still nor any other officer harassed plaintiff. Plaintiff did not address this aspect of the defendants' motions for summary judgment in her response, either by argument or

contradictory evidence. Therefore, the defendant's motions for summary judgment on this claim is granted.

## OUTRAGEOUS CONDUCT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff also seeks to recover for the tort of outrageous conduct, otherwise known as intentional infliction of emotional distress. *Bain v. Wells,* 936 S.W.2d 618, 622 n. 3 (Tenn.1997). * * * The Tennessee Supreme Court has summarized the elements of an outrageous conduct claim as follows:

[U]nder Tennessee law, there are three essential elements to [an outrageous conduct] cause of action: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury. *Id.*

With regard to whether actions are "outrageous," Tennessee adheres to the following standard:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice" or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous." *Id.* at 623 (quoting *Medlin v. Allied Inv. Co.,* 217 Tenn. 469, 398 S.W.2d 270, 274 (Tenn.1966) ( *abrogated on other grounds by Camper v. Minor,* 915 S.W.2d 437, 444-46 (Tenn.1996)).

*Northern v. Chase Scientific Glass, Inc.,* 207 WL 3286803 (E.D. Tenn. 2007).

The outrageous conduct for which plaintiff sues was the smashing of her door without a warrant; injuring her wrist in an effort to awaken her; threatening to take her to jail if she would not wake up; handcuffing her in her living room; taking her out into the hallway and

25

then arresting her for being intoxicated in a public place; arresting her for actions that the officer thinks she would commit; and arresting her without probable cause.[30]

An act for which a police officer is granted qualified immunity cannot, by definition, constitute "outrageous conduct." If it could, then the doctrine of qualified immunity would be meaningless. Also, plaintiff has come forward with no evidence that she has sustained any "serious mental injury." Accordingly, the defendants' motions for summary judgment regarding this claim are granted.

## CLAIMS FOR MALICIOUS HARASSMENT AND CLAIMS UNDER THE TENNESSEE HUMAN RIGHTS ACT

Plaintiff has withdrawn these claims; *see*, response, Document 58, page 30.

## SUIT AGAINST THE CITY OF BRISTOL

There is no separate legal entity known as the "Bristol, Tennessee Police Department;" the police department is but an agency of the City of Bristol.

All claims lodged against any officer in his official capacity is a claim against the city-employer, *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

To be liable under § 1983, a city must be guilty of some act or omission that amounts to deliberate indifference to the rights of the plaintiff, *Monell v. New York City Dept. of Social Services,* 436 U.S. 658 (1978). A city cannot be liable on the basis of *respondeat superior*; a city can be liable only for *its* actions, manifested by some municipal "custom or

---

[30]Response, Doc. 58, p. 29-30.

policy," *Monell, supra.*

A "failure to train," or inadequate training, or a failure to supervise, will support a claim of municipal liability under § 1983, but "only where the failure to train [or supervise] amounts to deliberate indifference to the rights of persons with whom the policy come into contact." *City of Canton v. Harris*, 489 U.S. 378 (1989).

Blaine Wade, Chief of the Bristol Police Department, filed an affidavit in support of the city's motion for summary judgment in which he states that all four officers – Still, Camper, Overbey, and Carter – had received all training required by the Peace Officer Standards Training Commission of the State of Tennessee, and were certified law enforcement officers in the State of Tennessee; and that he had no knowledge or information prior to January 17, 2009 that would have alerted him or the city of Bristol that any of these officers required further training or supervision.[31]

In 1981, the Tennessee legislature created the Peace Officers Standards Training ("POST") Commission, Tenn. Code Ann. § 38-8-101, *et. seq.* That Commission was and is charged with the responsibility of developing, planning, and implementing law enforcement training programs for all local law enforcement officers in the state of Tennessee.[32] Further, the Commission is required to establish unified standards for the employment and training of police officers, and to establish minimum standards and curriculum requirements offered by any political subdivision or agency for the purpose of

---

[31]Doc. 42.

[32]38-8-104.

training police recruits or officers.[33]  The minimum standards for police officers established by the Commission are binding on all governmental entities.[34]  The Commission issues a certificate of compliance to any person "who meets the qualifications for employment and satisfactorily completes an approved recruit training program."[35]

If Still and the other police officers were certified by the POST Commission, then the issue of the adequacy *vel non* of their training is resolved.  If the training was inadequate, then it necessarily follows that the standards established by the POST Commission was inadequate or, alternatively, that the facility at which these officers received their training, approved by the POST Commission, provided inadequate education and training, which again necessarily implicates the inadequacy of the POST Commission's requirements for training police officers in this state.

If it be assumed for the sake of discussion that the POST Commission's minimum requirements were deficient in some particular, or that a Commission-approved training facility rendered inadequate instruction notwithstanding that it was a facility approved by the Commission, either circumstance could not make the City of Bristol liable.  The POST Commission is the agency charged by the Tennessee legislature with establishing approved facilities for the training of all police officers in this state.

Of course, even though the training program itself is adequate, it is possible that the

---

[33] *Id.*

[34] 38-8-105.

[35] 38-8-107(a).

student, i.e., the police officer, forgot – or chooses to ignore – the training he received, as a result of which he violates someone's constitutional rights. That circumstance, of course, implicates a "failure to supervise." But a city cannot be deliberately indifferent for failing to supervise if nothing has occurred to put the city on notice that an officer needs additional training or discipline, *Gibson v. City of Clarksville, TN*, 860 F.Supp. 450 (M.D. Tenn. 1993). Referring once again to Chief Wade's affidavit, he had no knowledge or information prior to the events in plaintiff's apartment in January 2009 that Officer Still required further training or supervision.

In her response to the City's motion for summary judgment, plaintiff argues that Officer Still's lack of knowledge of the proper definition of probable cause is an indication of his lack of training. As previously discussed, Officer Still's definition of probable cause was substantially correct.

Plaintiff argues that the Bristol Police Department had a "practice of allowing officers to enter into a citizen's home without securing a warrant," and she refers to Sergeant Smalling's verbal authorization to Officer Still to kick in plaintiff's door as evidence of that custom or practice. All other considerations aside, a one-time authorization to kick in a door does not a custom or practice make. More importantly, for reasons previously discussed, a forced warrantless entry into plaintiff's apartment was justified by the exigencies of the situation.

Lastly, plaintiff argues that Officer Still's deposition testimony that he does not need a warrant to arrest a person, but only an affidavit, is a manifestation of the inadequacy of his

training. The colloquy between Officer Still and plaintiff's attorney during Still's deposition does not remotely suggest that Officer Still was or is ignorant of what is required before an arrest may be made. Under appropriate circumstances warrantless arrests in Tennessee are valid, and the commission of a misdemeanor in the sight and presence of a police officer will support a warrantless arrest; *see*, Tenn. Code Ann. § 40-7-103.

There is no evidence in this record from which a jury could conclude that the city was deliberately indifferent to plaintiff's rights, as a result of which the city's motion for summary judgment should be granted.

**CONCLUSION**

(1) The City of Bristol's motion for summary judgment,(Doc. 39), is GRANTED;

(2) Officer Camper's motion for summary judgment, (Doc. 43), is GRANTED;

(3) Officer Still's motion for summary judgment, (Doc. 47), is GRANTED;

(4) The suit against all "John Doe" defendants is DISMISSED on the court's own motion; and

(5) A judgment dismissing plaintiff's suit will be filed.

ENTER:

        s/ Dennis H. Inman
United States Magistrate Judge